260 N.J. Super. 292 (1992)
616 A.2d 523
T. JENNIFER VAIL; PETER TSAIRIS AND APHRODITE TSAIRIS, HUSBAND AND WIFE; APHRODITE TSAIRIS, AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE ESTATE OF ALEXIA KATHRYN TSAIRIS, DECEASED; AND PETER DYATRAKIS, PLAINTIFFS-APPELLANTS,
v.
PAN AM CORPORATION; PAN AMERICAN WORLD AIRWAYS, INC.; PAN AMERICAN WORLD SERVICES, INC.; ALERT MANAGEMENT SYSTEMS, INC.; THOMAS G. PLASKETT, AND MARTIN R. SHUGRUE, DEFENDANTS-RESPONDENTS, AND C. EDWARD ACKER, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1992.
Decided November 6, 1992.
*294 Richard A. Grossman argued the cause for appellants (Grossman & Kruttschnitt, attorneys; Richard A. Grossman of counsel; Thomas J. Heavey on the brief).
Elizabeth A. Bryson, admitted pro hac vice, argued the cause for respondents (Windels, Marx, Davies & Ives, attorneys; James M. Shaughnessy of counsel; Elizabeth A. Bryson on the brief).
Before Judges GAULKIN, HAVEY and STERN.
The opinion of the court was delivered by HAVEY, J.A.D.
The issue raised by this case is whether § 1305(a)(1) of the Airline Deregulation Act of 1978 (ADA), 49 U.S.C.A.App. §§ 1301 to 1557, which prohibits the states from enacting or enforcing any law "relating to rates, routes, or services" preempts plaintiffs' fraud, consumer fraud and breach of contract claims against an air carrier and its agents, servants and employees. The trial court granted defendants' motion for summary judgment, finding preemption. We agree. Plaintiffs' claims relate to an air carrier's rates and services and thus are expressly preempted by § 1305(a)(1). We therefore affirm the summary judgment order.
*295 The gravamen of plaintiffs' complaint is that from 1986 through 1989, defendants Pan Am Corporation and Pan Am World Airways falsely advertised they were initiating an enhanced security program, and fraudulently charged $5 per airline ticket to defray the cost of the program. Plaintiffs, who had purchased tickets during that period, claim that in fact the airline did not provide such a program. They charge that defendants' advertising constituted willful misrepresentation, consumer fraud, and deceptive business practice, and seek compensatory, treble and punitive damages against defendants.[1]
Since 1938, when Congress enacted the Civil Aeronautics Act, ch. 601, 52 Stat. 973 (1938), the federal government has imposed a pervasive regulatory scheme over civil aviation. Under that act, Congress created the Civil Aeronautics Authority (later changed to the Civil Aeronautics Board (CAB)) and vested it with broad powers to regulate commercial aviation, including the power to determine if air carriers were engaging in deceptive trade practices or unfair methods of competition. See Transworld Airlines, Inc. v. Mattox, 897 F.2d 773, 776-77 (5th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 307, 112 L.Ed.2d 261 (1990), aff'd on subsequent appeal, 924 F.2d 1055 (5th Cir.1991), aff'd in part and rev'd in part on other grounds sub. nom. Morales v. Trans World Airlines, Inc., 504 U.S. ___, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The Act also contained a "saving clause" stating that nothing contained in the Act would "abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 52 Stat. at 1027 (codified at 49 U.S.C.A.App. § 1506).
The Federal Aviation Act of 1958 (FAA), Pub.L. No. 85-726, 72 Stat. 731 (codified as amended at 49 U.S.C.A.App. §§ 1301 *296 to 1557), gave the CAB authority to regulate interstate airfares and to take administrative action against deceptive trade practices. It also preserved the "saving clause." See Morales, 504 U.S. at ___, 112 S.Ct. at 2034, 119 L.Ed.2d at 163-64. When the FAA was first enacted, the Supreme Court interpreted the law as enabling the states to regulate intrastate airfares and to enforce their own laws against deceptive trade practices. Id. at ___, 112 S.Ct. at 2034, 119 L.Ed.2d at 164; Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 300, 96 S.Ct. 1978, 1985, 48 L.Ed.2d 643, 652 (1976).
However, in 1978, Congress enacted the Airlines Deregulation Act (ADA), Pub.L. No. 95-504, 92 Stat. 1705 (1978) (codified at 49 U.S.C.A.App. §§ 1301 to 1557) to maximize reliance on "competitive market forces." Morales, 504 U.S. at ___, 112 S.Ct. at 2034, 119 L.Ed.2d at 164. To ensure that the states would not undermine the federal deregulation scheme with regulations of their own, the ADA included a specific preemption provision which prohibits the states from enacting or enforcing any law "relating to rates, routes, or services" of any air carrier. 49 U.S.C.A.App. § 1305(a)(1). Morales, 504 U.S. at ___, 112 S.Ct. at 2034, 119 L.Ed.2d at 164. The ADA also retained the CAB's existing enforcement authority over deceptive trade practices, but preserved the saving clause in the prior laws. Ibid.[2]
Plaintiffs contend that their claims are not preempted by § 1305(a)(1) because they do not seek to regulate rates or to "usurp the industry's authority to regulate security measures." Rather, their claims are "nothing more than traditional actions for fraud and breach of contract" and thus any effect on rates, routes, or services would be remote. In support of their argument, plaintiffs point to the "saving clause" of the FAA which, they argue, contemplates that unless the common law *297 claim and the federal Act are "absolutely inconsistent," they may coexist. See Nader, 426 U.S. at 300, 96 S.Ct. at 1985, 48 L.Ed.2d at 652.
Under the Supremacy Clause, U.S. Const. art VI, cl. 2, state laws that "`interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." Wisconsin Pub. Intervenor v. Mortier, 501 U.S. ___, ___, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532, 542 (1991) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 211, 6 L.Ed. 23 (1824)). Thus, "when the mandates of federal law and state law are not consistent, the state law must yield." Feldman v. Lederle Lab., 125 N.J. 117, 133, 592 A.2d 1176 (1991), cert. denied, ___ U.S. ___, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). The preemption doctrine applies equally to common law and state statutory law. Id. at 134, 592 A.2d 1176. Preemption may occur where Congress's intent to supplant state authority is clear from express language in the federal legislation or regulation. See Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977); Feldman, 125 N.J. at 134, 592 A.2d 1176.
Absent explicit preemptive language, Congress's intent to supersede state law in a particular field may nonetheless be implied from the pervasiveness of the federal regulatory scheme. In such a case, it is reasonable to infer that Congress left no room for the states to supplant the federal scheme. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1449 (1947); Feldman, 125 N.J. at 134, 592 A.2d 1176. Finally, even if Congress has not occupied a particular field, preemption may occur to the extent that state and federal law actually conflict. Mortier, 501 U.S. at ___, 111 S.Ct. at 2478, 115 L.Ed.2d at 543; Feldman, 125 N.J. at 134-35, 592 A.2d 1176.
The United States Supreme Court in Morales recently addressed the specific issue before us. There, the Court held that § 1305(a)(1) expressly preempted airline advertising guidelines *298 promulgated by the states and enforced by state attorneys general. 504 U.S. at ___, 112 S.Ct. at 2041, 119 L.Ed.2d at 169-71. It rejected precisely the same argument plaintiffs raise here, that § 1305(a)(1) only preempts the states from actually prescribing rates, routes, or services. The Court reasoned that such an interpretation "simply reads the words `relating to' out of the statute[,]" id. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 168, and had Congress intended "to pre-empt state law in such a limited fashion, it would have forbidden the States to `regulate rates, routes, [or] services.'" Ibid.
Morales also noted that the ordinary meaning of the words "relating to" is a broad one; that is, "`to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" Id. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 167 (quoting Black's Law Dictionary 1158 (5th ed. 1979)). It then compared § 1305(a)(1) to a similar provision in the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1144(a), and cited to a series of cases under ERISA giving the words "relating to" liberal meaning. Morales, 504 U.S. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 167. The Court concluded that "State enforcement actions having a connection with or reference to airline `rates, routes, or services' are preempted under [§ 1305(a)(1)]." Id. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 167-68 (emphasis added).
Morales also addressed the saving clause under the FAA, relied on by plaintiffs here, which purports to safeguard common law remedies. It concluded that the clause was a "relic of the pre-ADA/no pre-emption regime," and applied the "commonplace" statutory construction that the specific substantive preemption provision governs the general "saving clause." Id. ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 168. See also Wilson v. Unsatisfied Claim & Judgment Fund Bd., 109 N.J. 271, 278, 536 A.2d 752 (1988) ("when there is a conflict between general and specific provisions of a statute, the specific provisions will control"). The Court found that "[a] general `remedies' saving *299 clause cannot be allowed to supersede the specific substantive pre-emption provision" of § 1305(a)(1). Morales, 504 U.S. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 168.
In our view, Morales is dispositive. Plaintiffs' narrow interpretation of § 1305(a)(1) is unavailing in view of the broad interpretation given the section by Morales. As Morales notes, had Congress intended for § 1305(a)(1) only to preempt the states from actually prescribing rates, routes and services, it would not have used the "relating to" language. 504 U.S. at ___, 112 S.Ct. at 2037, 119 L.Ed.2d at 168. See In re Sussex County Mun. Util. Auth., 198 N.J. Super. 214, 217, 486 A.2d 932 (App.Div.) ("legislative language must not, if reasonably avoidable, be found to be ... superfluous or meaningless" (quoting Hackensack Bd. of Ed. v. City of Hackensack, 63 N.J. Super. 560, 569, 165 A.2d 33 (App.Div. 1960))), certif. denied, 101 N.J. 267, 501 A.2d 934 (1985). Plaintiffs' claims quite obviously "relat[e] to" airline fares and services. They assert that defendants falsely advertised they had initiated a "far-reaching security program," employing "highly trained security experts" for the purpose of providing a "safe and secure environment for [their] passengers." This claim clearly relates to the "services" of an air carrier. Plaintiffs also allege that throughout the years 1986 through 1989, defendants charged an "extra $5 each way per passenger" to help defray the cost of the "new, efficient and professionally operated security system" when in fact the security system was never implemented. This claim, at the very least, indirectly relates to the "rates" charged by an air carrier.
To allow plaintiffs' claims would permit state courts to determine whether an airline's advertising was false and deceptive, and whether services advertised were in fact provided. If the airline's conduct were fraudulent or deceptive, state courts could fashion remedies, applying state law, proscribing certain advertising and compelling the airline to repay customers surcharges and other "rates" charged to air passengers. The *300 result would be multiple and potentially conflicting standards controlling airline advertising, services and rates.[3] The conclusion is inescapable that Congress intended to reject the dual enforcement of state law claims relating to rates and services, and to vest the federal Department of Transportation with the exclusive authority to regulate and adjudicate allegations of deceptive and fraudulent advertising and practices in the airline industry. See 49 U.S.C.A.App. § 1381 (granting the Department of Transportation authority to investigate unfair trade practices in the airline industry).[4]
In arguing that § 1305(a)(1) should be narrowly construed, plaintiffs rely heavily on the Ninth Circuit's approach in West v. Northwest Airlines, Inc., 923 F.2d 657 (9th Cir.1990), cert. granted and judgment vacated, ___ U.S. ___, 112 S.Ct. 2986, 120 L.Ed.2d 864 (1992). There, a passenger who had been "bumped" from his flight because of overbooking sued the airline for breach of good faith and fair dealing. Id. at 658-59. *301 West found no express preemption, holding "Section 1305(a)(1) preempts claims only when the underlying statute or regulation itself relates to airline services, regardless of whether the claim arises from a factual setting involving airline services. Thus, state laws that merely have an effect on airline services are not preempted." Id. at 660. However, the West interpretation of § 1305(a)(1) is no longer viable, since one week after the Supreme Court decided Morales, it granted certiorari in West, vacated the judgment and remanded to the Ninth Circuit for reconsideration in light of Morales. 504 U.S. ___, 112 S.Ct. 2986, 120 L.Ed.2d 864.
Plaintiffs also rely on our recent opinion in Miller v. Northwest Airlines, 253 N.J. Super. 618, 625-26, 602 A.2d 785 (App. Div. 1992), where we held that § 1305(a)(1) does not preempt an airline passenger's state law causes of action for false arrest and negligent and intentional infliction of emotional distress. There, plaintiff sued the airline after being detained because he was holding a cigarette lighter in his attache case which resembled a toy pistol. Id. at 621-22, 602 A.2d 785. In concluding that there was no preemption, the Miller court, relying on West, found that common law tort and contract claims merely have an effect on those "services," and reasoned that "[i]f plaintiff is successful in his claims, that will not interfere in any manner with the airlines' operation of proper security for passengers boarding with carry-on baggage." Id. at 625, 602 A.2d 785.
In our view, Morales casts serious doubt on the holding in Miller, particularly because Miller relied heavily on West. In any event, the facts and nature of the claim in Miller are distinguishable. There, plaintiff's tort claims arose out of a single incident tangentially related to the "service" of an airline. Here, by contrast, plaintiffs challenge the "service" itself and demand as damages the return of the "rate" the airline charged for promised "services" never provided. We are satisfied § 1305(a)(1) expressly preempts plaintiffs' claims. Since we find express preemption, we need not decide whether the *302 ADA impliedly preempts, or is in conflict with, state law. See Cippollone, ___ U.S. at ___, 112 S.Ct. at 2633, 120 L.Ed.2d at 423; Mattox, 897 F.2d at 783.
We also reject plaintiffs' newly-found argument that even if their claims against the airlines are preempted, their claims against the individual defendants are not. First, the contention was never raised below, and it is well-settled that reviewing courts "will decline to consider questions or issues not properly presented to the trial court when [the] opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern great matters of public interest.'" Nieder v. Royal Indem., 62 N.J. 229, 234, 300 A.2d 142 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548, 156 A.2d 737 (App.Div. 1959), certif. denied, 31 N.J. 554, 158 A.2d 453 (1960)); see also Murin v. Frapaul Constr. Co., 240 N.J. Super. 600, 613, 573 A.2d 989 (App.Div. 1990). Here, plaintiffs' new claim does not bear on a court's jurisdiction, nor does it implicate a great matter of public interest.
Second, we agree with defendants that to allow plaintiffs' claims against the carriers' agents, servants and employees, would undermine the basic goals of the ADA. In their complaint plaintiffs assert that the purported fraudulent and deceptive practices were committed by the airlines "by and through their agents and employees, including the individual defendants." Permitting plaintiffs' claims against the individuals vitiates the exclusive federal occupation of the field of aviation, and frustrates the broad preemptive purpose of § 1305(a)(1) to create a unified system of airline regulation. Plaintiffs would circumvent this purpose by bringing suit against the agents and employees of the airlines, thus fostering the very dual enforcement and regulation proscribed by § 1305(a)(1). Cf. Reed, 555 F.2d at 1089-90 (airline employees fall within definition of "carrier" under the Warsaw Convention, and are thus protected by the pact's liability limitations); *303 In re Air Disaster, Lockerbie, Scotland, Dec. 1988, 776 F. Supp. 710, 713-14 (E.D.N.Y. 1991) (nonemployee "agent" of airline is "carrier" under the Warsaw Convention because the airline had statutory duty to provide safety measures carried out by agent on airline's behalf). Simply stated, the preemptive force of § 1305(a)(1) would be frustrated if the provision was broadly interpreted in favor of the airlines, but found inapplicable to the agents and employees who carry out the airlines' functions "relating to rates, routes, or services." Accordingly, we hold that the preemptive reach of § 1305(a)(1) extends to agents, servants and employees of an airline as well as the airline itself.
Affirmed.
NOTES
[1] Plaintiffs also seek to represent the entire class of individuals who purchased tickets from defendants from 1986 through 1989. The class has not yet been certified.
[2] Enforcement authority was transferred to the Department of Transportation in 1984. See The Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 1703, 1704 (1984).
[3] Moreover, allowance of such claims against the airlines may raise difficult conflict of law questions. See generally Veazey v. Doremus, 103 N.J. 244, 247-48, 510 A.2d 1187 (1986) (New Jersey follows governmental interest analysis to resolve conflict of law problems); Restatement (Second) of Conflicts of Laws § 148 (1971) (conflict of law rules regarding fraud and misrepresentation). What state law, or indeed, foreign law would apply when a multi-state class of plaintiffs assert consumer fraud and breach of contract claims bottomed on the airline's national or international advertising campaign? Cf. Reed v. Wiser, 555 F.2d 1079, 1090, 1092 (2d Cir.) (Warsaw Convention limits liability against agents and employees because contrary result would cause "jungle-like chaos" in applying the "thicket of foreign laws" in multi-party litigation), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). Because courts may be called upon to interpret and apply a variety of state anti-fraud laws, the purpose of § 1305(a)(1), to create a uniform system of airline regulation, would be undermined.
[4] In Cippollone v. Liggett Group, Inc., ___ U.S. ___, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Supreme Court recently held that certain common law claims against a cigarette manufacturer were not preempted by the Public Health Cigarette Smoking Act of 1969, 15 U.S.C.A. §§ 1331 to 1340. Id. at ___, 112 S.Ct. at 2625, 120 L.Ed.2d at 431-32. Here, by contrast, § 1305(a)(1) is far broader than the preemption statute in Cippollone.